UNITED STATES DISTRICT COURT DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>ROSNIL ORTIZ | No. 22-cr-10257 |

### DEFENDANT'S MOTION TO DISMISS THE INDICTMENT PURSUANT TO *BRUEN* AND MEMORANDUM

The defendant in this case, Rosnil Ortiz, respectfully requests that this Court dismiss the above-referenced indictment for failure to state a case pursuant to the Supreme Court's opinion in *New York State Rifle & Pistol Association, Inc. v. Bruen*, 142 S. Ct. 2111 (2022). [1] The *Bruen* case marked a dramatic shift in Second Amendment law. Before *Bruen,* courts decided Second Amendment challenges by balancing the strength of the government's interest in firearm regulation against the degree of infringement on the challenger's right to keep and bear arms. *Bruen* rejected that approach, instructing courts to consider only "constitutional text and history." *Bruen*, 142 S. Ct. at 2128-29. If "the Second Amendment's plain text covers an individual's conduct," then under *Bruen*, "the Constitution presumptively protects that conduct." *Id*. at 2126. To rebut the presumption, the government "must demonstrate" that a challenged law "is consistent with the Nation's historical tradition of firearm regulation." *Id*. The test for historical consistency is demanding: a firearm regulation is consistent with American tradition only if similar regulations were widespread and commonly accepted in the founding era, when the Second Amendment was adopted. *See id*. at 2136.

Under the framework mandated by *Bruen*, the Court should dismiss the single-count indictment, which charges Mr. Ortiz with a violation of 18 U.S.C. § 922(g)(1). Because possession of a firearm comes

---

[1] Ortiz recognizes this District's current position on *United States v. Torres- Rosario*, 658 F. 2d 110 (1st Cir.), namely its foreclosure on argument as to the constitutionality of 922(g)(1) in both facial and as-applied challenges.  However, because the First Circuit has yet to consider *Bruen'*s impact on *Torres-Rosario* and *Torres-Rosario* did not utilize the standard established by *Bruen* to analyze Second Amendment claims, Ortiz nonetheless files this motion, arguing that *Torres-Rosario* does not control the Court's analysis here, despite recent decisions in this District.

within the Second Amendment's "plain text," Mr. Ortiz's conduct is presumptively protected, and the government cannot rebut that presumption. Felon-disarmament laws, which did not appear in the United States until the 20th Century, were unknown to the generation that ratified the Second Amendment. Therefore, pursuant to the analysis set forth in *Bruen*, the indictment must be dismissed for failure to state an offense.

### I.     FACTS

Mr. Ortiz is an American citizen. Mr. Ortiz was indicted for being a felon in possession of a weapon and ammunition. See Indictment, dkt. # 15. The following alleged facts stem from the affidavit of ATF Special Agent John Mercer, dkt # 1.

1. On approximately May 28, 2022, Revere Police were present at the Squire in Revere on a detail. Around 2:05 AM on that date, one of the Revere Police Officers, Officer Ahern, responded to a conflict in the parking lot of the Squire.

2. Officer Ahern saw a large fight taking place.  He announced his presence as a Revere police officer and the fighting stopped.

3. Multiple men ran from the area of the alleged fight and Officer Ahern ordered one of the men running past him to stop.  Police identified this individual as the defendant, Rosnil Ortiz.

4. As Officer Ahern ordered Ortiz to stop, Officer Ahern grabbed Ortiz's arm.  Ortiz allegedly responded to Officer Ahern grabbing his arm by throwing a punch at Officer Ahern with his free hand.

5. Officer Ahern and Ortiz engaged in a physical "struggle" with one another.  During this struggle, Officer Ahern allegedly commanded Ortiz multiple times to stop resisting.

6. Ortiz allegedly freed himself of Officer Ahern and got into the front seat a black Volkswagen nearby.

7. Another Revere Police Officer, Officer Osorio, also got into the black Volkswagen and both officers repeatedly told Ortiz to stop resisting.

8. During officers' struggle with Ortiz, Officer Ahern allegedly saw Ortiz reach in between the middle console and passenger side front seat of the car, where Ortiz allegedly grabbed a handgun. Officer Ahern allegedly alerted Officer Osorio verbally that Ortiz had a gun.

9. Officer Osorio allegedly knocked the handgun out of Ortiz's grasp and onto the front passenger side floor.

10. Ortiz was arrested and officers found $6000 on Ortiz's person and a bag containing on pound of marijuana inside the Volkswagen.

11. This firearm was subsequently identified as a Smith & Wesson .380 caliber semi-automatic handgun bearing serial number NLF5374, which was loaded with 8 rounds of .380 caliber ammunition.

12. Ortiz's alleged possession of this handgun is the subject of this prosecution.

Mr. Ortiz has the following prior adult felony convictions:

1. 1:16CR10164, U.S. District Court for the District of Massachusetts, Conspiracy to Distribute Controlled Substances (28 Grams or More of Cocaine Base)

2. 1:17-cr-10394, U.S. District Court for the District of Massachusetts, Felon in Possession of a Firearm

3. 0952CR2677, Cambridge District Court, Carrying a Firearm without a License, Assault and Battery on a Police Officer, Carrying a Loaded Firearm without a License, Possession of Firearm without FID Card, Possession of Class D

4. 1006CR0605, West Roxbury District Court, Possession of Class A (Heroin), Assault with Dangerous Weapon

5. 1456CR7364, Quincy District Court, Assault and Battery on a Police Officer, Intimidating a Witness, Possession with Intent to Distribute Class A (Heroin)

## II.    LEGAL STANDARDS

Rule 12(b)(3)(B)(v) of the Federal Rules of Criminal Procedure states that any "defenses, objections, and requests" regarding "a defect in the indictment or information," including "failure to state an offense," "must be raised by pretrial motion if the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." Fed. R. Crim. P. 12(b)(3)(B)(v).

## III.   ARGUMENT

A. *Bruen* Altered the Legal Landscape for the Regulation of Firearm Possession.

    i. Before *Bruen,* Lower Courts Assessed Second Amendment Challenges by Applying Means-Ends Scrutiny.

The Second Amendment provides, "A well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, 554 U.S. 570 (2008), the Supreme Court held that the Second Amendment codified a pre-existing individual right to possess and use firearms for lawful purposes like self-defense. *Heller*, 554 U.S. at 592, 624. The Court canvassed "the historical background of the Second Amendment." Id. at 592. Based on that survey, the Court concluded the right protected by the Second Amendment is "not limited to the carrying of arms in a militia." Id. at 586. Rather, the Second Amendment confers an individual right to keep and bear arms that "belongs to all Americans." Id. at 581.

In *McDonald v. City of Chicago*, 561 U.S. 742 (2010), the Court reaffirmed *Heller'*s "central holding" that "the Second Amendment protects a personal right to keep and bear arms for lawful purposes, most notably for self-defense within the home." *McDonald*, 561 U.S. at 780. That right, the Court warned, should not be treated "as a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees[.]" Id.

Following *Heller* and *McDonald*, the federal courts of appeals developed a two-step inquiry for deciding Second Amendment challenges. See *Bruen,* 142 S. Ct. at 2126-27; id. at 2127 n.4. The first step "ask[ed] whether the challenged law burdens conduct that falls within the scope of the Second Amendment's guarantee." *Gould v. Morgan*, 907 F.3d 659, 668-69 (1st Cir. 2018). If the challenged law imposed "no such burden, it [was] valid." Id. at 669. But if the statute did burden Second Amendment conduct, courts then "determine[d] what level of scrutiny [was] appropriate and . . . proceed[ed] to decide whether the challenged law survive[d] that level of scrutiny." Id. Courts employed strict scrutiny if a challenger's claim implicated the core right identified in *Heller*, "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." Id. at 672 (quoting *Heller*, 554 U.S. at 635; quotation marks omitted). Otherwise, intermediate scrutiny applied. Id. Both forms of scrutiny involved weighing the governmental interest in firearm restrictions against the challenger's interest in exercising his right to keep and bear arms. See id. at 670-671.

    ii.    *Bruen* Replaced Means-Ends Balancing with a Test Rooted Solely in the Second Amendment's "Text and History."

In *Bruen*, the Supreme Court squarely rejected such "judge-empowering" tests, *Bruen*, 142 S. Ct. at 2129, instructing courts to firmly respect the "balance . . . struck by the traditions of the American people" as embodied in the Second Amendment. Id. at 2131. The Supreme Court stated that "*Heller* and *McDonald* do not support applying means-end scrutiny in the Second Amendment context." Id. at 2127. The Court was emphatic that going forward, courts should consider only "constitutional text and history," id. at 2128-29, which are now the only relevant steps in the analysis.

At the first step, *Bruen* clarified, if "the Second Amendment's plain text covers an individual's conduct," then "the Constitution presumptively protects that conduct." Id. at 2129-30. To rebut the presumption, at the

4

second step, the government must show that a challenged law "is consistent with the Nation's historical tradition of firearm regulation." Id. at 2135. This test requires courts to "consider whether 'historical precedent' . . . evinces a comparable tradition of regulation." Id. at 2131-32. If "no such tradition" exists, then the statute being challenged is unconstitutional. Id. at 2132. Insofar as there are "multiple plausible interpretations" of an ambiguous historical record, courts must "favor the one that is more consistent with the Second Amendment's command." Id. at 2141 n.11. Put differently, the tie goes to the Second Amendment claimant.

The Court explained that "[c]onstitutional rights are enshrined with the scope they were understood to have when the people adopted them." Id. at 2136 (quoting *Heller*, 554 U.S. at 634- 35; internal quotation marks omitted). For that reason, the relevant historical tradition for purposes of a federal gun regulation is that which existed in 1791, when the Second Amendment was ratified. See id. at 2136.

Courts may look to the tradition of firearms regulation "before . . . and even after the founding" period, but they should do so with care. Id. at 2131-32. The Court cautioned, for example, that "[h]istorical evidence that long predates [1791] may not illuminate the scope of the [Second Amendment] right if linguistic or legal conventions changed in the intervening years." Id. at 2136. Conversely, courts must "guard against giving postenactment history more weight than it can rightly bear." Id.

The *Bruen* opinion explains that the standard for reviewing the government's historical evidence differs depending on what kind of problem a statute is intended to remedy. "In some cases," where a challenged statute "addresses a general societal problem that has persisted since the 18th century," the historical inquiry "will be fairly straightforward." Id. at 2131. The government can defend such statutes by identifying a tradition of "distinctly similar" regulations from the founding era. Id.
In "other cases," where a statute addresses a problem that was "unimaginable at the founding," a less demanding standard applies. Id. at 2132. This standard "involve[s] reasoning by analogy," id., or asking whether a modern firearm regulation and a historical analogue are "relevantly similar," in terms of whether they "[1] impose a comparable burden on the right of armed self-defense and [2] whether that burden is comparably justified." Id. at 2132-33.

5

*Bruen* emphasized repeatedly that "the burden falls on [the government] to show that [a statute] is consistent with this Nation's historical tradition of firearm regulation." Id. at 2135. Courts are "entitled to decide a case based on the historical record compiled by the parties." Id. at 2130 n.6. As a result, courts "are not obliged to sift the historical materials for evidence to sustain [a] statute. That is [the government's] burden." Id. at 2150.

### B. 18 U.S.C. § 922(g)(1) Is Facially Unconstitutional

Section 922(g)(1) fails both steps of the *Bruen* analysis. First, the Second Amendment's plain text covers Mr. Ortiz's conduct of possessing a firearm and ammunition. Second, the government cannot carry its burden of establishing a historical tradition of felon-disarmament laws. As a result, section 922(g)(1) is facially unconstitutional, and the Court should dismiss the indictment.

    i.    *Bruen* Step One: The Second Amendment's Plain Text Covers Mr. Ortiz's Conduct of Possessing Firearms and Ammunition.

At step one of the *Bruen* analysis, the Court asks whether "the Second Amendment's plain text covers the individual's conduct." Id. at 2126. That text contains three elements, guaranteeing the right (1) "of the people," (2) "to keep and bear," (3) "arms." *Heller*, 554 U.S. at 579-86. As explained below, Mr. Ortiz and his conduct fall squarely within each element.

    a.    Mr. Ortiz Is Among "The People" Protected Under the Second Amendment.

In *Heller*, the Supreme Court explained that when the Constitution refers to "'the people,' the term unambiguously refers to all members of the political community, not an unspecified subset," id. at 580, and that there is a "strong presumption that the Second Amendment right is exercised individually and belongs to all Americans." Id. at 581. While some of *Heller's* language does link Second-Amendment rights with the notions of "law-abiding citizens" and "members of the political community," those passages did not reflect an attempt to word "people" – for which the Second Amendment guarantees the right to keep and bear arms. *See United States v. Taylor*, 2024 WL 245557 (No. 23-cr-40001, S.D. Ill. Jan. 22, 2024), citing *United States v. Meza- Rodriguez*, 798 F. 3d 664, 669 (7th Cir. 2015). The Supreme Court "has never suggested that felon are not among the people within the meaning of the Second Amendment." *United States v. Duarte*, 101 F.4th 657 (9th Cir. 2024), *citing United States v. Perez-Garcia,* 96 F. 4th 1166, 1175 (9th Cir. 2024). Quite the

opposite, *Heller* defined "the people" in the broadest of terms: the phrase "unambiguously refer[red]" to "all Americans," not "an unspecified subset." *Id*, citing *Heller*, 554 U.S. at 581. More importantly, *Bruen* ratified that broad definition, quoting *Heller*'s language directly to hold that "[t]he Second Amendment guarantee[s] to '*all Americans*' the right to bear commonly used arms in public." *Bruen*, 597 U.S. at 70 (quoting *Heller*, 554 U.S. at 581) (emphasis added).

Mr. Ortiz is an American citizen and lifelong member of the national community. Thus, the Second Amendment's use of the phrase "the people" unambiguously refers to him. See id. at 580. Just as the Second Amendment does not "draw[] a home/public distinction with respect to the right to keep and bear arms," *Bruen*, 142 S. Ct. at 2134, it also does not draw a distinction between felons and non-felons. See *United States v. Jimenez-Shilon*, 34 F.4th 1042, 1046 (11th Cir. 2022) (describing felons as "indisputably part of 'the people'" under the Second Amendment); *United States v. Meza-Rodriguez*, 798 F.3d 664, 671 (7th Cir. 2015) (holding that a person's criminal record is irrelevant in determining whether the person is among "the people" protected under the Second Amendment; noting that the Second Amendment "is not limited to such on-again, off-again protection.").

    b.  Mr. Ortiz's Alleged Conduct Falls Within the Right to "Keep and Bear Arms."

As the Court recognized in *Heller*, the word "keep" means "[t]o have in custody" or to "retain in one's power of possession." *Heller*, 554 U.S. at 582 (internal citation and quotation marks omitted). And the word "bear" means "to 'carry.'" Id. at 584. Moreover, the Court held in *Bruen* that the meaning of "bear" even includes carrying in public outside the home. *See Bruen,* 142 S. Ct. at 2134-35 ("To confine the right to 'bear' arms to the home would nullify half of the Second Amendment's operative protections."). Thus, the Court has made clear that the text of the Second Amendment protects the right to possess a firearm both inside and outside the home.

The term "arms" refers to "[w]eapons of offense, or armour of defence." *Heller*, 554 U.S. at 581 (internal citation and quotation marks omitted). The Supreme Court has construed the term as "extend[ing] . . . to all instruments that constitute bearable arms, even those that were not in existence at the time of the founding." Id. at 582. And it has specifically held that the term protects the right to possess "handguns," id. at

3

629, which were in "common use" at the founding. Id. at 627 (internal citation and quotation marks omitted). The indictment alleges that Mr. Ortiz possessed a Smith & Wesson .380 caliber semi-automatic handgun bearing serial number NLF5374, which was loaded with 8 rounds of .380 caliber ammunition. Both come within the definition of "arms." See *Ass'n of N.J. Rifle & Pistol Clubs, Inc. v. Attorney Gen. of N.J.*, 910 F.3d 106, 116 (3d Cir. 2018) ("ammunition is necessary for [] a gun to function as intended"), abrogated on other grounds by *Bruen*, 142 S. Ct. 2111*; Jackson v. City of San Francisco*, 746 F.3d 953, 967 (9th Cir. 2014) ("without bullets, the right to bear arms would be meaningless").

    ii.    *Bruen* Step Two: Section 922(g)(1) is Inconsistent with the Nation's Tradition of Firearm Regulation.

"[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *Bruen*, 142 S. Ct. at 2126. To rebut the presumption, the government must establish that section 922(g)(1) "is consistent with this Nation's historical tradition of firearm regulation." Id. But the "general societal problem" that section 922(g)(1) is designed to address – felons with access to guns – is one "that has persisted since the 18th century[.]" Id. at 2131. As a result, section 922(g)(1) is unconstitutional unless the government shows a robust tradition of "distinctly similar historical regulation[s] as of 1791, when the Second Amendment was ratified. Id. The government cannot make that showing.

What is today section 922(g)(1) traces its origins to 1938, when Congress passed the Federal Firearms Act, which prohibited certain felons from receiving firearms. See *United States v. Skoien*, 614 F.3d 638, 640 (7th Cir. 2010) (en banc) (citing Federal Firearms Act, c. 850, § 2(f), 52 Stat. 1250, 1251 (1938)). At that time, the statute "covered only a few violent offenses," id., prohibiting firearm possession by those convicted of crimes such as murder, rape, kidnapping, and burglary. *Booker,* 644 F.3d at 24. It was not until 1961 that Congress amended the statute to prohibit "possession by all felons." *Skoien,* 614 F.3d at 640 (citing Pub. L. 87–342, 75 Stat. 757); see also Booker, 644 F.3d at 24. Seven years later, "Congress changed the 'receipt' element of the 1938 law to 'possession,' giving 18 U.S.C. § 922(g)(1) its current form." *Skoien*, 614 F.3d at 640. Therefore, section 922(g)(1) "is firmly rooted in the twentieth century[.]" *Booker*, 644 F.3d at 24.

Regulations of such recent vintage cannot establish a historical tradition unless they confirm earlier practice. *See Bruen*, 142 S. Ct. at 2137. Indeed, in *Bruen,* the Court said it would not even "address any of the 20th-century historical evidence brought to bear by respondents or their amici" since such evidence "does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." Id. at 2154 n.28.

In short, there was no "historical tradition" circa 1791 of gun regulations "distinctly similar" to section 922(g)(1). Id. at 2130-31. The "Founders themselves could have adopted" laws like section 922(g)(1) to "confront" the "perceived societal problem" posed by felons. Id. at 2131. But they declined to do so, and that inaction indicates section 922(g)(1) "[is] unconstitutional." See id.

The government cannot attempt to justify section 922(g)(1) by resorting to "analogical reasoning." Id. at 2132. According to *Bruen,* that mode of analysis is available only when a Second Amendment challenge "implicat[es] unprecedented societal concerns," "dramatic technological changes," or "modern regulations that were unimaginable at the founding." Id. But the potential danger posed by felons' access to firearms would have been neither unprecedented nor unimaginable to the Founders. Furthermore, Mr. Ortiz is unaware of a historical tradition of founding-era statutes that are "relevantly similar" to section 922(g)(1). Id. (internal citation and quotation marks omitted). The government therefore cannot shoulder its burden of rebutting the presumption of unconstitutionality.

   iii.    The First Circuit's Prior Rulings Regarding 18 U.S.C. § 922(g)(1) Do Not Control Following Bruen.

Mr. Ortiz recognizes and is aware of the holdings such as that in *United States v. Fulcar*, 2023 U.S. Dist. LEXIS 192908 (D. Mass. October 27, 2023) in this circuit, for example, which state that "binding First Circuit precedent" in *United States v. Torres- Rosario*, 658 F. 2d 110 (1st Cir.) forecloses Mr. Ortiz's facial and as-applied challenges to Section 922(g)(1). However, because the First Circuit has yet to consider *Bruen'*s impact on *Torres-Rosario* and *Torres-Rosario* did not utilize the standard established by *Bruen* to analyze Second Amendment claims, *Torres-Rosario* does not control the Court's analysis here, despite recent decisions in this District. *See, e.g., United States v. Parsons,* No. 21-10343-NMG, 2024 U.S. Dist. LEXIS 68908 (D. Mass. Apr. 16, 2024)*; United States v. Johnson*, No. 23-cr-10043-ADB, 2024 U.S. Dist. LEXIS

9483 (D. Mass. Jan. 18, 2024)*, United States v. Barnard*, *United States v. Barnard*, No. 1:23-cr-00035-JAW, 2023 U.S. Dist. LEXIS 211846 (D. Me. Nov. 29, 2023), *Fulcar,* 2023 U.S. Dist. LEXIS 192908 (D. Mass. October 27, 2023); *United States v. Pringle*, No. 22-10157-FDS, 2023 U.S. Dist. LEXIS 193924 (D. Mass. Oct. 30, 2023), *United States v. Giambro,* 676 F. Supp. 3d 9 (D. Me. 2023).

After *Heller* and before *Bruen,* the First Circuit addressed the constitutionality of section 922(g)(1) in *United States v. Torres-Rosario*, 658 F.3d 110 (1st Cir. 2011). It also addressed Second Amendment challenges to 18 U.S.C. § 922(x)(2)(A), which bans juvenile possession of handguns, and 18 U.S.C. § 922(g)(9), which prohibits firearm possession by individuals convicted of misdemeanor crimes of domestic violence. See *Rene E*., 583 F.3d 8 and *Booker,* 644 F.3d 12.

*Torres-Rosario* involved both facial and as-applied challenges. Regarding the facial challenge, Torres-Rosario stated only that "[a]ll of the circuits to face the issue post *Heller* have rejected blanket challenges to felon-in-possession laws." *Torres-Rosario,* 658 F.3d at 113 (citing cases). The court undertook no analysis of the historical tradition of felon disenfranchisement regulations. Although *Torres-Rosa*rio did not cite to either case, the First Circuit did engage in some discussion of the historical tradition of firearm regulation in two prior cases: *Rene E.* (juvenile possession of handguns) and *Booker* (misdemeanants convicted of domestic violence).

In *Rene E*., the First Circuit cited thirteen state cases criminalizing the sale to and in some instances the possession of guns by juveniles from 1858 to 1926. *Rene E*., 583 F.3d at 14-15. Acknowledging that these cases only went back as far as the Civil War period, the Court noted that there was "some evidence" that the Founders would have shared this view and noted that limitations on juvenile possession "were sometimes expressed as efforts to disarm the 'unvirtuous.'" Id. at 15 (internal citation omitted). It then observed that "[i]n this sense, the federal ban on juvenile possession of handguns is part of a longstanding practice of prohibiting certain classes of individuals from possessing firearms – those whose possession poses a particular danger to the public." Id. (citations omitted).

In *Booker,* the First Circuit acknowledged language in *Heller,* including that the "right secured by the Second Amendment is not unlimited*," Heller*, 554 U.S. at 626, and "nothing in our opinion should be taken

6

to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill," id., were passages that had been "the subject of much debate in the courts as well as extensive academic commentary," *Booker,* 644 F.3d at 22, and that "[t]he full significance of these pronouncements is far from self-evident." Id. at 23. The *Booker* opinion frankly acknowledged that "the modern federal felony firearm disqualification law . . . is firmly rooted in the twentieth century and likely bears little resemblance to laws in effect at the time the Second Amendment was ratified." Id. at 23-24. However, it reasoned that "[t]he recency of enactment and the continuing evolution of this 'presumptively lawful' limit on gun ownership support the conclusion that, 'although the Justices have not established that any particular statute is valid, . . . exclusions need not mirror limits that were on the books in 1791.'" Id. at 24 (quoting *Skoien,* 614 F.3d at 641). The court went on to hold that the categorical ban on gun ownership by misdemeanants convicted of domestic violence was supported by a "'strong showing[]'necessitating a substantial relationship between the restriction and an important government objective." Id. at 25 (quoting *Skoien,* 614 F.3d at 641).

The *Booker* analysis is directly contrary to the central premise of *Bruen* – that to determine if a specific firearms regulation is constitutional, a court must assess whether the government has "affirmatively prov[ed] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms*."* *Bruen*, 142 S. Ct. at 2127. Moreover, while *Booker* states that "exclusions need not mirror limits that were on the book in 1791," *Booker,* 644 F.3d at 24, *Bruen* sets forth strict guidelines for when a court may "reason[] by analogy" – only when a statute addresses a problem that was "unimaginable at the founding," *Bruen,* 142 S. Ct. at 2132, and not when a challenged statute "addresses a general societal problem that has persisted since the 18th century[.]" Id. at 2131. Therefore, the First Circuit's prior analysis cannot control this case.

The subsequent District Court opinions in this Circuit, see, e.g., *United v. Pringle,* No. CR 22-10157, 2023 WL 7135176 (D. Mass. Oct. 30, 2023); *United States v. Fulcar*, No. 23-CR-10053, 2023 U.S. Dist. LEXIS 192908 rely on *Torres-Rosario,* which Mr. Ortiz contends that notwithstanding recent decisions in this District, has been "unmistakably been cast into disrepute by a supervening authority" because the case does not does not undertake the analysis required by *Bruen. See Eulitt v. Me. Dep't of Educ*., 386 F.3d 344,

7

349 (1st Cir. 2004) (until a court of appeals revokes a binding precedent, a district court within the circuit is hard put to ignore that precedent unless it has unmistakably been cast into disrepute by supervening authority. *See also United v. Pringle,* No. CR 22-10157, 2023 WL 7135176 (D. Mass. Oct. 30, 2023); *United States v. Fulcar*, No. 23-CR-10053, 2023 U.S. Dist. LEXIS 192908. Because *Bruen* set a new standard for evaluating Second Amendment challenges, which was not conducted or even attempted in *Torres-Rosario* or the opinions that *Torres-Rosario* relied upon, *Torres-Rosario* does not foreclose arguments as to the constitutionality of 922(g)(1) as the district court cases within this circuit hold. At least one opinion that *Torres-Rosario* cited to support its conclusion that section 922(g)(1) is constitutional reached that decision by conducting means-end balancing, an approach the Supreme Court has now definitively rejected. *See United States v. Williams*, 616 F.3d 685, 692-93 (7th Cir. 2010) (applying intermediate scrutiny). Because the district court cases concerning the application of *Bruen* to 922(g)(1) in this circuit do not establish that section 922(g)(1) "is consistent with the Nation's historical tradition of firearm regulation," it should not be followed. *Bruen* at 2130.[2]

### C. 18 U.S.C. § 922(g)(1) Is Unconstitutional as Applied to Mr. Ortiz.

In *Torres-Rosario*, the First Circuit observed that "the Supreme Court may be open to claims that some felonies do not indicate potential violence and cannot be the basis for applying a categorical ban." *Torres-Rosario*, 658 F.3d at 113. The First Circuit held, "[a]ssuming arguendo that the Supreme Court might find some felonies so tame and technical as to be insufficient to justify the ban, drug dealing is not likely to be among them" because it is "notoriously linked to violence." Id. Mr. Ortiz is aware of the current state of First Circuit law and this Circuit's view of Mr. Ortiz's class of felony convictions in an as-applied *Bruen* challenge. Nonetheless, he presents his arguments here. Assuming, for arguments' sake and as envisioned by *Torres-Rosario*, that felony status is not the dispositive, federal courts have previously rejected the "dangerousness analogues" used by the Government to support disarmament of "violent persons." *See, e.g.,*

---

[2] The Fifth Circuit concluded that section 922(g)(8), which prohibits people who have been subject of a domestic violence restraining order from possessing a firearm, as unconstitutional following *Bruen*. *See United States v. Rahimi*, No. 21-11001, 2023 WL 1459240 (5th Cir. Feb. 2, 2023). Also, the Western District of Oklahoma determined that section 922(g)(3), which prohibits an unlawful user of narcotics from possessing a firearm, does not meet constitutional muster after *Bruen*. *See United States v. Harrison*, No. CR-22-00328, 2023 WL 1771138 (W.D. Ok. Feb. 3, 2023). *Bruen* should lead the Court to the same conclusion regarding section 922(g)(1).

*United States v. Rahimi*, 61 F. 4th 443, 450 (5th Cir. 2023); *United States v. Jones*, 2024 WL 86491 (No. 3:23-cr-74, S.D. Miss. Jan. 8, 2024). American history does not support disarmament laws passed for generalized interests of public safety. *Jones* at 4. With respect to whom the right to keep and bear arms belongs, nothing in the Second Amendment's text draws a distinction between those who are virtuous and those who are not." *Duarte*, 101 F.4th at 44. As a result, 922(g)(1) is unconstitutional as applied to Mr. Ortiz as well.

### IV.  CONCLUSION

Section 922(g)(1) is not consistent with the nation's historical tradition of firearm regulation and violates the Second Amendment both facially and as applied to Mr. Ortiz. The Court should therefore dismiss the indictment for failure to state an offense.

Respectfully submitted,
CLAUDIA LAGOS
By his attorney

*/s/ Claudia Lagos*
Claudia Lagos
B.B.O. #681504
Scully & Lagos
10 Post Office Sq, Suite 1330
Boston, MA  02109
Tel: 617-307-5055

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on June 17, 2024

                                             */s/ Claudia Lagos*
                                             Claudia Lagos